Ben H. PARRISH et al., Appellants,

v.

The STATE of Texas, Appellee.

No. 10541.

Court of Civil Appeals of Texas. Austin.

Feb. 12, 1958.

Rehearing Denied March 5, 1958.

Henry H. Brooks, Gaynor Kendall, Austin, for appellants.

Will Wilson, Atty. Gen., James H. Rogers, Asst. Atty. Gen., Robert L. Burns, Houston, of counsel, for appellee.

ARCHER, Chief Justice.

This is an eminent domain proceeding instituted in the County Court of Travis County by the State of Texas, appellee here, to take by condemnation certain property in the City of Austin belonging to defendants-appellants. The right of the State to take the property subject to its obligation to pay damages for the taking was admitted and trial to a jury was therefore limited to the sole issue of damages. Upon the special issue verdict of the jury, the State was by final judgment of the County Court awarded the land sought to be condemned; the appellants were adjudged to have and recover as their damages the sum of $33,000 which the jury found to be the cash market value of the lands on November 5, 1956.

The appeal is based on seven points assigned as error and are as follows:

"Point I. The State having elicited from its witness the prices at which the subject property and other tracts had sold as much as six years previously, and the witness having testified that in forming his opinion as to market value, he had 'adjusted' the earlier sales 'to current date'; and the witness having testified that the rate of increase used was 5% per annum, based in part on average increases he established from sales and resales of nearby properties, the trial court erred in refusing to permit appellants to elicit by cross-examination that the witness had

excluded and did not take into account specific sales and resales within the area in which the witness had testified that he had collected sales data.

"Point II. Appellants' right of cross-examination of the witness Legge was abridged by refusal of the Court to allow them to elicit from him three sales of one property (adjacent to tracts whose sales prices he had introduced on direct) which reflected an average annual increase of 26.64%.

"Point III. Appellants' right of cross-examination of the witness Legge was abridged by refusal of the trial court to allow them to elicit from him that if he had included all sales and resales within a more limited area than he employed, but one more closely surrounding the subject property, the average increase would have been more than fifteen per cent, instead of the five per cent increment figure used by the witness to 'adjust' earlier sales prices of properties in the area.

"Point IV. The State having elicited from its witness Legge that the Employees' Association had purchased the property located at the northwest intersection of West 14th and Congress for $42,000 in 1953, the trial court erred in excluding rebuttal testimony by appellants' witness Watts that the same association shortly thereafter refused a bona fide offer of $66,000 for an unimproved part of the identical property.

"Point V. The trial court erred in excluding the testimony of appellants' witness Watts mentioned in Point IV, supra, in that it was clearly admissible in rebuttal of previous testimony elicited by the State from its witness Legge to the effect that the property located within the vicinity of the subject property enhanced in value at an average rate of 5% per annum.

"Point VI. The trial court erred in excluding the testimony of Austin councilman Lester Palmer, that Ralph Wolf, the Executive Director of the Building Commission, had requested deferment of adoption of a city ordinance abrogating the off-street parking requirements applicable to property back of the Capitol because it might increase property values in that Area.

"Point VII. The trial court erred in excluding evidence offered by defendants relating to rents lost by them as a direct result of taking of the property, and over and above the market value thereof, to-wit:

"(a) Testimony of appellant Parrish that the Building Commission, through its executive officer Wolf, notified appellants' tenant by letter in April of 1956, that adherence to the schedule adopted by the Commission would require surrender of the premises 'by August 15, 1956;' that as a result of such notice, the tenant moved from the premises on May 1, 1956, and the appellants consequently lost monthly rentals from May 1, 1956 to December 14, 1956.

"(b) Testimony of Wolf, Executive Director of the Commission, that such letters were sent by him pursuant to the program adopted by and under the authority of the Building Commission."

The errors complained of are directed primarily to the failure of the Court to permit appellants to question witness Legge concerning the sale of certain properties and the use of such sales in arriving at an adjusted value of such sales, in fixing the value placed on the property involved in this suit.

The appellants having admitted that the appellee, the State, had the right to recover as set out in its petition to condemn the property for the purposes stated, and that the only question to be determined is of just compensation and the amount of damages, were granted the right to open and close the case.

Lynn C. Dure, one of the owners, testified as to his experience in buying and selling real estate and of making loans thereon, and as to the purchase of the property in 1953 for $25,000 and as to the improvements and the subsequent removal of one building, and as to the rental of the premises and other use thereof. The witness testified that he listed the property in 1954 with an agent at $75,000 and fixed a cash market value of between $68,000 and $70,000 for the property.

W. T. Caswell testified as to his qualifications and as to numerous purchases and sales of properties in Austin and fixed the market value of this property at $60,000.

Ben H. Parrish, one of the owners, testified as to the purchase of the property in 1953 for $25,000, and fixed the market value of the property on November 6, 1956 at $65,000, and gave other testimony as to the use of the property and the rentals, its location, etc.

W. T. Mobley, one of the appellants, testified as to the ownership of the subject property and as to its location and uses and fixed the market value of $65,000.

Sterling Sasser, Sr. testified concerning his dealings in real estate and insurance and that the value of property and particularly commercial property, has had a tremendous inflationary spiral, and the growth of the city had been substantial; that he was familiar with the properties in the area north of the Capitol between 13th and 16th Streets, and owned an interest in a lot in the 1600 block on North Congress, and that he made an appraisal of the property owned by appellants, detailing city improvements and best usage and fixed the market value of the property as of November 5, 1956 at $70,000.

E. G. Kingsbury testified that in his opinion, based on long experience in making investments, buying, selling and leasing rental property, the cash market value of the property on November 5, 1956 was $65,000 and detailed its location, and best usage. The witness further testified in detail concerning his knowledge of real property and the elements that go into determining the value of property.

Appearing as a witness called by the State Tom Graham testified that the market value of the Parrish property on November 5, 1956 was $32,000.

James C. Cochran fixed the value of the property at $33,500.

Forrest Pearson fixed the value of the property at $34,500.

Each of the above testified as to his qualifications as an expert.

Appellee called Harold Legge, who testified that he was a real estate appraiser but did a small amount of brokerage business and had been such for a number of years and was a member of the society of Residential Appraisers and several other similar organizations and detailed his experience and qualifications and the appraisals made in Austin, and that he was employed by the State Building Commission to make an appraisal of properties located behind the Capitol and to be acquired by the State, and was being paid a fee by the State for making appraisals

The testimony of the witness is long and in detail as to what he did and the source from which he derived information in making the appraisals and fixed the market value in cash of the property involved in this suit as of November 6, 1956, at $31,500.

The witness described the property as to its location and zoning classification and the steps he followed in making his appraisal; that he secured from an abstractor all the sales in the area and the periphery of the neighborhood or district and inspected all of the properties to determine the scarcity factor, the use and other things such as income and rentals, talked to many of the owners and tenants. Mr. Legge testified that the most reliable data to be used as a factual basis for forming an opinion of value are sales in recent years, and that he

considered the property between Lavaca Street and San Jacinto and running north from 13th Street to 19th Street as the neighborhood in which the subject property is located.

The witness testified that he took each city block and broke it down into square foot areas and then took a percentage of the property that was zoned C–1 Commercial and C–Commercial and that per cent zoned for residential use and described such zoning and the development of such property and most of the improvements are older residential.

Questions were directed to the witness by counsel for the State with reference to the downtown area and the witness said that development was west toward the Courthouse, and a change of trend over to the east side of Congress Avenue when the Commodore Perry Hotel and other major buildings were constructed, and that his analysis is restricted to the area from Lavaca and San Jacinto and 11th and 19th Streets. The witness detailed the uses of the properties within this area and the traffic count on all of the streets, and also the number of State employees. Some of the sales data used by the witness went as far west as San Antonio Street.

On cross examination the witness testified that he had the data covering several hundred sales at his office, some of which he used and some he didn't; that the area about which the witness had been talking, in which he gathered some two or three hundred sales, of which some were used, is bounded on the north by 19th Street, on the west by San Antonio Street, on the south by 11th Street and on the east by Trinity Street.

The witness testified that out of the two or three transactions within the area, as defined and analyzed, he actually used 97 sales in arriving at the value of the property in suit and considered such to be comparable to this property; that in comparing the Parrish property with the other tracts he made adjustments of sales prices up or

down and the time of sale was adjusted to current data, and as has been stated, arrived at $31,500 as the market value on November 5, 1956—$29,000 for the land and $1,500 for salvage value of the building and $1,000 for pavement.

Mr. Legge testified that he did not take into account in computing the 5% increment figure the sales and resales since 1950 on the Lowich property at the corner of Guadalupe and 11th Streets, and upon being asked what was the first sale of that property since 1950, objection was made by counsel for the State that such sales and resales were inadmissible because the witness had testified he did not include it as one of the sales on which he based his 5% figure.

The jury was retired and inquiries about the Lowich property were excluded, along with all inquiries by counsel for appellants designed to test by cross examination the 5% figure used by Legge.

The following transpired:

"Q. Well, now, this morning, Mr. Legge, I requested that you bring over here this afternoon all of your sales in the area that you said you investigated, which included from 19th Street south to 11th Street and from San Antonio east to Trinity, and the area I have asked you about is within that, isn't it? A. I have that information with me, but it will take some time to make a comparison of the sales and resales. I don't believe you asked for that this morning. You asked me for all the sales.

"Q. All the sales since 1950, didn't I? A. Yes, sir. I have that.

"Q. Well, I am inquiring now only about sales since 1950, and I am directing your attention to the Lowich tract, which is diagonally across the street from the northeast corner of the Courthouse and is located on the northeast corner of the intersection of Guadalupe

and 11th Streets. What was the first sale of that property since 1950?

"Mr. Burns: If the Court please, I am going to object to any inquiry and testimony relating to any sale of property at the corner of 11th and Guadalupe Street on the ground that there is no evidence whatsoever that that property is any way comparable to the subject property, and that any information on the sale of that property will in any way be informative as to the value of the subject property, and there has been no testimony by this witness that it was a factual basis of his opinion or that he relied upon that sale or any sale of that property, and it is simply—it is an attempt to indirectly get in direct evidence which the defendants cannot get in during their own case and which they have not tried to put in by their own case.

"Mr. Brooks: If the Court please, this is directed to that five percent increment figure, and it is property within the area he said he made his investigation in.

"Mr. Burns: He has not testified that that was what he considered the neighborhood within which there were comparable sales. He simply said that it was a wide area in which he had an abstractor furnish him sales.

"The Court: If I understand counsel's question, it goes to the sales and resales on which the five percent increment was based?

"Mr. Kendall: Or will be tested, Your Honor.

"Mr. Brooks: I want to test it by these, Your Honor. I have no way of knowing what he based it on.

"The Court: I understood that you are referring to sales upon which he had—which he had used upon which to arrive at the five percent increment average.

* * * * * *

"Mr. Kendall: Your Honor, in testing the validity of the figure which the witness has testified he concluded was a percentage factor of increase by comparing sales and resales in a certain area we are not limited, we submit, simply to the several properties which he employed in arriving at that. In other words, I can arrive at any figure I want if you will let me select the properties. We propose to go into questions with him on a number of other resales, or if he has the information available, every resale in that area, and to relate the percentage of increase due to growth factors, based not only on the few sales or the hand-picked sales that he made, but on all of them. And we don't think we should be limited simply to the ones that he picked as the basis for his conclusion, but should be allowed to show that he excluded a number of sales which we think should have been included in determining that percentage, and that it will show a much higher percentage of increase than the one testified to.

"Mr. Burns: Now, Your Honor, the only testimony which they are seeking to question is the testimony by Mr. Legge that in arriving—that there was a general increase of five percent per year in values, not that there was a five percent increase in each and every year, but that over a period of time there was an annual five percent increase—he partly arrived at that by considering sales and resales of property in this neighborhood. Now, then, if you are going to be allowed to go into and introduce direct evidence of sales any and every place to test it, you are not getting in this neighborhood, so we might as well get down on Congress Avenue property, or get out on South Congress Avenue property, or somewhere else. Mr. Legge has testified that he received data from an abstractor on the area they are ask-

ing about, but he has never testified that that is what he considers the area in which this property was included and the area in which properties may be compared; and to get way over here adjacent to the Courthouse is completely out of the area behind the Capitol Building. And I submit that if we are going to get into sales remotely located, the Court is opening the door to have sales come in from all over town, and they will not be probative on the increase in the value in the neighborhood.

"The Court: Well, I understood the area was going to be limited from 11th to 19th and San Jacinto to Trinity.

\*   \*   \*   \*   \*   \*

"The Court: Well, that is all right, I thought Mr. Legge said he considered the sales from the abstractor from 11th to 19th, or was it from 11th to 15th this morning that you testified to? A. No, sir. I considered the sales from not only 11th, I considered sales also in the downtown area in order to get a relationship between the rentals and sales; for no other reason. The sales on 11th Street were not considered in any manner as being comparable to this property. The five percent increase was arrived at only partially by taking sales and resales up from 19th on back to the Capitol, just to the Capitol; I didn't use the sales around toward Congress because they are not comparable properties and the—actually it is only considered to show the contrast, to show that this area the increase was not as great as it was around on the side and down south.

"Mr. Burns: Did you, Mr. Legge, in any way consider the property at the corner of 11th and Guadalupe comparable to the subject property? A. That property is not comparable in any form at all. In the first place, the

use to which it could be put is entirely different than the subject property.

\*   \*   \*   \*   \*   \*

"The Court: I understood you to say while ago that you didn't make any adjustment to every— A. To every property, that is true. In other words, if I relied entirely on the Collett property and some of these more recent sales, it would have no bearing on this appraisal whatsoever. The trouble with me is that I am not given an opportunity of going into detail to explain more in detail on this five percent adjustment. If I am allowed to give my opinion—I mean my reasoning, and the way I treated that, why, I will be glad to go into it. Certainly sales of property down here—the purpose of this, in the first place, was to show the difference in the market here and other areas. That is the only reason I asked for these sales. It takes a long time to analyze—in the first place, the Lowich property he is talking about, there is a lot of things involved in that that would have to be considered in an appraisal before you could— you can't simply just take the figures and—in the first place, the—

"Mr. Burns: Well, don't try to explain it.

"The Court: Well, I think I better sustain the objection and you make your bill. Have you got all you want in the bill?"

■ Defendant's Bill of Exceptions No. 5 sets out in detail the questions on cross examination seeking to determine the sales and resales of property within an area between 15th Street on the north, 11th Street on the south, San Jacinto Street on the east and Guadalupe Street on the west, with reference to the five per cent enhancement, and particularly with reference to the Lowich property, all efforts to pursue such cross examination were overruled.

We believe that in view of the testimony of witness Legge as to the area from 11th to 19th Streets north and south and from San Antonio to San Jacinto Streets east and west that the cross examination of the witness should have been permitted.

This testimony was adduced by the State as to the larger area and cross examination should not have been restricted to enable appellant to test the accuracy and soundness of the conclusions as to value testified to of testimony on direct examination.

Eastern Texas R. Co. v. Scurlock, 97 Tex. 305, 78 S.W. 490; Evansich v. Gulf, C. & S. F. R. Co., 61 Tex. 24.

 As is stated in Pecos & N. T. R. Co. v. Porter, Tex.Civ.App., 156 S.W. 267, the purpose of cross examination is to sift and to modify and have the witness explain what he has said on direct examination.

Terrell v. General Motors Acceptance Corp., Tex.Civ.App., 59 S.W.2d 442, er. ref.; 19 Tex.Jur. 233, 234, "Expert and Opinion Testimony," (Sec. 151).

The jury had the right to hear the testimony on cross examination in order to establish in their minds whether the witness Legge knew the fact inquired about and to further determine if such answers would tend to alter the conclusion of the witness and the accuracy of his opinion and upon his credibility as a witness.

The fact that the witness did not consider the area comparable, or the properties inquired about comparable, were his reasons for excluding them in his computation and whether these reasons were valid or not would have tended to determine the weight to be given by the jury to the opinion of the witness.

It is to be observed that the evidence as given by the witness for the State fixed the value of the property from $30,500 to $33,500 and by witnesses for appellants from $60,000 to $70,000, and there was sharp conflict in the values, and witness Legge, employed by the State as an appraiser, gave far more testimony than did all other witnesses and it was in an effort to offset this testimony that the cross examination was undertaken and we believe that such was admissible.

As to the other assignments we do not believe such to constitute reversible errors.

The judgment of the Trial Court is reversed and the cause is remanded.